[No. 319. Decided December 3, 1891.]

E. MEEKER AND FRED. MEEKER, *Appellants*, v. IRA JOHNSON, *Respondent*.

REPLEVIN—VERDICT—SALES—WHEN TITLE PASSES—WAIVER.

In an action for the recovery of personal property, the jury should, under § 241, Code 1881, assess the value of the property whether their verdict be in favor of plaintiff or defendant.

Under a contract for the sale of a crop of hops whereby the grower agrees to complete their cultivation, pick, cure and bale them and deliver same at a certain time and place, of choice quality, even color, well and cleanly picked and thoroughly cured, and keep said hops insured to cover any advances made thereon by the purchaser, payment for the hops to be made upon delivery and acceptance, the title to the hops does not pass upon their acceptance, but upon payment of the contract price.

The fact that defendant helped to put the hops in a car prepared by plaintiffs, after they had been weighed and inspected, does not amount to a waiver of the right of possession, where, under the contract, the hops are to be paid for upon their acceptance, and defendant refuses to allow plaintiffs to assume control of them until payment.

*Appeal from Superior Court Lewis County.*

Action by E. Meeker and Fred. Meeker, under the firm name of E. Meeker & Co., against Ira Johnson, to recover

possession of certain hops which plaintiffs claimed under a contract of sale. Judgment for defendant, and plaintiffs appeal.

*Doolittle, Pritchard, Stevens & Grosscup,* and *Reynolds & Stewart,* for appellants.

*John Mayo Palmer,* and *James M. Pickens,* for respondent.

The opinion of the court was delivered by

DUNBAR, J.—The articles of agreement out of which this action grew are as follows:

"This agreement, made and entered into this ninth day of August, 1890, by and between Ira Johnson, of Napavine, county of Lewis, and state of Washington, party of the first part, and E. Meeker & Company, of Puyallup, in the county of Pierce, State of Washington, parties of the second part:

"Witnesseth, that the said party of the first part, for the consideration hereinafter named, has sold, transferred and set over, and by these presents does sell, transfer and set over, unto said parties of the second part, their heirs and assigns, and agree to deliver to said parties of the second part, between the twentieth day of September, 1890, and the twentieth day of October, 1890, at the Northern Pacific Railway station at Napavine, 10,000, more or less, being the entire crop of hops of the growth of the year 1890, more particularly described as ten thousand pounds of hops belonging to said party of the first part and now growing upon his own farm near Napavine.

"The said party of the first part further agrees to complete the cultivation of said hops and in due season to pick, cure and bale the same in bales of about 180 pounds each, seventy-one pounds per bale allowed as tare on 200 pounds, and at the same time and place above specified to deliver the same of strictly choice quality, of even color, well and cleanly picked, and thoroughly cured, but not high dried.

"In consideration whereof, the said parties of the second part agree to pay said party of the first part the sum of

twenty cents per pound for said hops as follows, to wit:
—— cents per pound, being the sum of —— dollars, upon
execution of said contract, the receipt of which sum is
hereby acknowledged by said party of the first part;——
cents per pound, being the sum of —— dollars, for picking
purposes, on demand after the —— day of September,
18—; twenty cents per pound, or the balance that may be
due upon said hops, upon delivery and acceptance of the
same by said parties of the second part.

"It is further agreed that said party of the first part
shall keep said hops insured from the time the same are
picked until they are delivered, in a sum equal to all ad-
vance that shall have been made by said parties of the
second part. Above insurance is not necessary unless
part payment is made before delivery of hops.

"In witness whereof the said parties have hereunto set
their hands and seals the day and year first above written.

"Signed, sealed and delivered in presence of Ed. Kilborn.

"Ira Johnson.      (seal.)

"E. Meeker & Co. (seal.)"

The 19th day of October, 1890, fell on Sunday. The evi-
dence shows that on the 15th day of October the defendant
began hauling the hops to the station at Napavine; on the
17th finished, and on the 18th, which was Saturday, the
hops were inspected and weighed by Lowry, plaintiffs'
agent, and placed in a car which had been ordered by
plaintiffs. They finished putting the hops in the car about
three o'clock in the afternoon. They were placed there
by the assistance, and with the consent, of the defendant.
Then there was a conversation between Lowry and defend-
ant, the substance of which was that defendant demanded
the money down for the hops, and told Lowry he would
give him until twelve o'clock that night to pay him, and if
he was not paid by that time that he should claim the hops
as his. Lowry answered that he would telegraph down to
the chief office and see what could be done. This conver-
sation occurred after the hops had been put in plaintiffs'
car, and there was no dispute about the quantity or value

of the hops. On account of the condition of the wires Lowry was unable to telegraph, and jumped on the next train and went to Chehalis, and from there telegraphed his principal at Puyallup, not reaching Chehalis, however, until after the bank had closed for the day. It seems it would have been impossible for him to have reached Chehalis before the bank closed, leaving Napavine after weighing and calculating the value of the hops. It is conceded that there is no bank in Napavine, and that the bank at Chehalis is the nearest bank. On the opening of the bank on Monday morning Lowry procured the money and returned to Napavine by the nearest and most direct means of conveyance, arriving there about 11 o'clock A. M., and tendered to Johnson in gold coin the full contract price for the hops, which Johnson refused to receive, claiming that plaintiffs had broken their contract, and that the hops were his. Sometime during that afternoon Johnson opened the car which was still standing on the side track and removed the hops therefrom. On the 27th of October following, plaintiffs brought an action of replevin for the recovery of the possession of the hops, or for their value in case delivery could not be had, and damages for their detention in the sum of five hundred dollars, alleging the value of the hops to be $3,538.80. Upon the filing of the complaint, and. the proper process, the sheriff seized the hops, and as defendant did not interpose any bonds for their redelivery, after the statutory time for furnishing such bonds had expired, the sheriff delivered the hops to the plaintiffs, who disposed of them. The defendant answered averring ownership of the hops and right of possession, and alleging the value of the hops at $4,044, and praying that the court should determine that he was the owner and entitled to the possession. The case was tried before a jury, and the following verdict rendered:

"We, the jury, find the issues for the defendant, and

that the defendant Ira Johnson is the owner and entitled to the possession of the hops described in the pleadings herein."

Exceptions were taken to the verdict on account of its form. There seems to be no essential convict of testimony on the real facts in issue, and its consideration involves principally a determination of the law governing the facts.

We will first notice the contention that the verdict does not substantially comply with § 241 of the code governing procedure in this character of cases. While it must be confessed that the section in question does not meet the strict requirements of any known work on composition or rhetoric, either in punctuation or phraseology, yet we think a liberal construction of the whole, with the object in view of rendering intelligent and effective every portion of the section, will lead to the conclusion that the legislature was intending to enact the statute that has been enacted in so many states, and provide that where the property has not been delivered to the plaintiff, and he recover, the jury shall assess the value of the property, or where the defendant in his answer claims a return thereof, it shall assess the value of the property. Without going into a lengthy analysis of this section it will be seen that any other construction will render meaningless a great portion, if not all, of the section. Under this statute we think the jury should have found the value of the property. It is contended by the respondent that if this was an error that it was not prejudicial to the plaintiffs, and that they cannot be heard to object to it, and some early California cases, decided under a similar statute, are cited which seem to sustain this contention. But it seems to us that their reasoning is fallacious, and their conclusions unfounded. The only theory upon which this doctrine can be sustained is that this action would be a bar to any subsequent action by defendant to enforce his judgment, or to

obtain damages for non-performance of its requirements by plaintiffs. This seems to have been the theory in *Morrison v. Austin*, 14 Wis. 601, cited by respondent. In that case the court says:

"The right to take a personal judgment, if for any reason a return of the property cannot be obtained, is clearly intended for the defendants' benefit. It is necessary for his protection where he elects to have a return and fails in securing it. If he chooses to waive it and take the chances of obtaining a return of the property or realizing nothing from his judgment, the plaintiff ought not to object."

The same idea seemed to obtain with the court in *Waldman v. Broder*, 10 Cal. 378, for the court says:

"Nor is there anything in the failure to give an alternative judgment for the value of the property. This omission might be complained of by defendants if they had shown the value; but it is no ground of complaint on the part of the plaintiff."

But we hardly think the respondent, while accepting the conclusions of these courts, would adopt their premises; and yet in our judgment the conclusions can only be justified by the premises. In another case cited, *Nickerson v. California Stage Company*, 10 Cal. 520, in an opinion rendered by Chief Justice TERRY, the court reaches the same conclusions, but destroys the theory that the plaintiff has no interest in the matter, and holds that the judment in replevin did not constitute a bar to the action of trover, the judgment in replevin not having been satisfied. Says the court:

"The defendant objects that under our statute there should have been a finding of the value in the replevin suit, and an alternative judgment for the return of the property or the payment of its value. This would have been necessary to enable the plaintiff to recover against the sureties on the replevin bond, but the failure to do so cannot affect his rights as to the defendants. There are many kinds of

property which have a peculiar value in the eye of the owner far beyond their intrinsic worth. In an action for the possession of such property, the plaintiff would prefer to lose his right to proceed against the sureties rather than enter an alternative judgment, the effect of which might be to enable the defendants to retain the property by paying its estimated value."

It is difficult to see in what way the alternative judgment could defeat the right to have the property returned. The alternative is that the value of the property shall be paid in case the property *cannot* be returned. Where it *can* be returned the judgment for its return will be enforced notwithstanding the alternative judgment. While it is no doubt true, as insisted by respondent, that the language of the section, as well as the facts of legal history, indicate that this section is designed to be mainly legislative of a right already existing, it is equally true that common law replevin may be extended or limited by statute. In fact, so far as the history of this remedy is concerned, the operation of the writ at common law was continually changing and enlarging. The action originally lay for the purpose of recovering chattels taken as a distress, and for no other purpose. This seems to be questioned in *Williamson v. Ringgold*, 4 Cranch C. C. 39, a very ably discussed case, but nevertheless this view of its history has received the sanction of such writers as Blackstone, Gilbert, Wells and Cobbey, and we think may be accepted as true. Originally the writ was not restrictive; it was a judicial writ issued to the sheriff and giving him powers to hear and determine the matter, and the defendant could not set up a claim of ownership in the replevin suit, it being confined to the legality of the distress. Afterwards the defendant was allowed to set up ownership, but on this question the sheriff was not trusted with judicial powers, and the writ was made returnable to the court; and during the progress and development of this character

of action its scope was continually enlarging, and by statute it has been still further enlarged. Says Cobbey on Replevin, § 9:

"Although the technical action of replevin has been abolished by statutes in many of the states, and, strictly speaking, cannot be said to exist in any of them, an action for the recovery of specific personal property is recognized in nearly all of them, and, generally, all the remedies formerly secured to parties by the action of replevin and trover may be had in a single action of replevin or its statutory equivalent under another name, to recover a chattel, or its value, and damages for its detention.

This is evidently the object of our statute, to combine the actions of replevin and trover, and to adjudicate in one action all the questions involved, and which are necessary to completely determine and settle the matter in controversy. This is the general policy of the law, and such a construction will be put upon a statute whenever its terms will permit. The value of the hops were placed in issue by the pleadings. In the event that the hops had been destroyed by fire, or had been disposed of in any way so that a return could not be effected, this value would become very material in enforcing the judgment against plaintiffs, and they should not be put to the expense of another trial and another jury to ascertain a fact which was presented to this jury by the pleadings. We think the cases cited by appellants sustain this view, and that the verdict was not in compliance with the mandatory provisions of the statute, and therefore illegal.

The next contention of the appellants is, that under the contract of sale the title to the hops in question passed to the vendee with the execution and delivery of the contract. This proposition raises a very interesting question which has largely employed the attention of courts from their earliest history down to the present time, and the difficulty of determining the intention of the parties to the contract

where such intention is not clearly expressed, has led to the necessity of establishing certain arbitrary rules or tests to determine its effect.

The first rule of Lord Blackburn is as follows:

" Where by the agreement the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is to be bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property."

The rule, we believe, embodies the universally accepted law, both in England and America.   Benjamin, in his work on Sales (Bennett's Notes), § 318, in speaking of the American rule, fairly represents it when he says:

" In America, also, it is well settled that if by the terms of the contract any thing is to be done by the vendor, by way of finishing the goods, or getting them ready for delivery (not now speaking of weighing, measuring, or counting merely), the title does not pass until this is done, unless the contrary intention clearly appears from the terms of the sale, the language and conduct of the parties, as applied to known usages and the subject-matter of the contract."

And cites the case of *Foster v. Ropes*, 111 Mass. 10, where R. bought of H. a "fare" of fish (about 800 quintals), at six dollars per quintal, which H. was to put on the flakes to dry a half day or more, and then to weigh before delivery to R.   It was held that the title did not pass before the drying and weighing, so as to enable the vendor to sue for goods sold and delivered.   The court, in its opinion, lays down the rule that " when, by the terms of the contract, the seller agrees to do anything for the purpose of putting the property into a state in which the buyer is bound to accept it, or into a condition to be delivered, the title will remain in him until he has performed the agreement in this respect," and quotes approvingly,

*Rugg v. Minett*, 11 East, 210, and *Morse v. Sherman*, 106 Mass. 430, where the same doctrine was substantially announced. In *Halterline v. Rice*, 62 Barb. 593, the plaintiff went into the shop of B. & Co., and finding there a cutter in an unfinished state, made a bargain with them for it, whereby they were to finish and deliver it to him within a week or ten days for a specified price, which was afterward paid. The cutter remained in the poesession of B. & Co., unfinished. B. &. Co. failed and made an assignment of their property for the benefit of creditors to the defendant, who took possession of and sold it. Held, that the title to the cutter did not pass to the plaintiff. In *Hale v. Huntley*, 21 Vt. 147, where the owner of coal pits which were in process of burning, sold the charcoal which might be taken therefrom at a specified price for each one hundred bushels, and agreed that he would complete the burning, and draw the coal to vendee's place of business, and the vendor accordingly continued to have charge of the coal until it was attached by his creditors, before it had been measured and delivered to the vendee, it was held that the vendee acquired, by the contract, no property in the coal, even as between himself and vendor. In fact, without further particularizing, this seems to be the general current of decision; and this contract must then be examined with reference to this well established rule. We do not controvert the causes cited by appellants, but think that they can easily be distinguished from the one at bar. In *Graff v. Fitch* 58 Ill. 373; 11 Am. Rep. 85, there was nothing left to be done to the corn to render it deliverable. (Of course, the question of segregation was not in that case, nor in this.) There was a certain amount of work, it is true, that the vendor was to do on the corn, but it could in no wise affect the quality of the corn. The vendee bought the corn outright, and his acceptance of it did not depend upon the quality of it at the time of the agreed delivery;

there was no exercise of skill required by the vendor, but the vendee was to take the corn without qualifications as to kind or quality.   In that case the instructions to the jury were that "if by the terms of the purchase the defendant was to cut and snap a part of the corn, etc., that no title passed to the purchaser," and the court very properly held that such a construction excluded from the jury any reference to the intention of the parties, and the court in reviewing the case insists that certain testimony offered on the trial indicated the intention of the parties to make the sale absolute, as, for instance, that the purchase was shown to have been made by the vendee for the purpose of securing the rent then due by the vendor.

In *Arkansas Valley Land & Cattle Co. v. Mann*, 130 U. S. 69 (9 Sup. Ct. Rep. 458) all that was decided was that the provisions in a bill of sale of cattle, that the seller shall retain possession until and as security for the payment of the price, is not inconsistent with an actual sale by which title passed to the buyer.   The court also, in speaking of the language of the contract, says:

"Slagle and Jordan certainly intended to vest Mann with the title at the date of the bill of sale in question; for that instrument recites that the owners had on the day of its execution, 'sold' the cattle to him, and that recital is followed by clauses guaranteeing the title, and providing the mode in which the buyer was to make payment.   Here are all the elements of an actual sale, as distinguished from an executory agreement."

But the contract in this case is essentially different from the contract construed by the court above.   It is true that the formal word "sold" is used in this contract, as in that; but so it is in a great majority of contracts of this kind where it is not claimed by either party that they are anything more than executory contracts.   This may be, and doubtless is, one expression among others, to indicate the intention of the parties; but it is only one, and is not con-

17—3 WASH.

clusive when the other conditions in the contract indicate a different intention. It is a legal conclusion, rather than a statement of fact.

By the articles of agreement in this case it is plainly indicated that Meeker & Co. did not buy the hops outright, but only agreed to pay for them on condition that first they must mature and grow into hops of strictly choice quality. In addition to this, the vendor was to complete the cultivation, and to bale them and deliver them of strictly choice quality, of even color, well and cleanly picked and thoroughly cured, but not high dried. If any of these conditions failed, that is to say, if the defendant had neglected to cultivate them, or if they had been delivered and found to be not of even color and cleanly picked or thoroughly dried, or not of a strictly choice quality, Meeker & Co. could not have been compelled to receive them, for they would not have been of the character and kind of hops for which they contracted. And this view of the case is taken by the appellees in their brief, on page 38, where they say:

"Of course, plaintiff was required to act promptly and in good faith, but no more. He was not required to anticipate that these hops would be of the quality and quantity described in the contract. The contract describes about ten thousand pounds of hops. The quantity might have been much less or much greater and still have fallen within the purview of the terms of the contract. They might have been of an inferior color and improperly baled —circumstances which would have excused the plaintiff from taking them."

They either bought the hops that were growing there, or they did not; they must seize one horn of the dilemma and abide with it. To hold that the sale is unconditional where there are so many "conditions precedent" plainly expressed, would be to wipe out the distinction between conditional and unconditional sales.

In this contract it is especially provided that the vendor shall keep the hops insured, not for the value of the hops, for the benefit of the vendor; but for a sum equal to the advances that shall have been made by the vendee, with a provision that such insurance is not necessary unless payments be made before delivery of the hops. It seems to us there can be but one construction placed on this provision, and that is that the vendee did not consider himself responsible for the hops in case they were burned. Neither do we think the possession, or right of possession, passed when the goods were accepted. The acceptance of the goods was but one step to be taken by the vendee before the possession would pass, but there was another step which must be taken, and that was the payment. Even where nothing has been said as to payment, the law presumes that the parties intended to make the payment of the price and the delivery of the possession concurrent conditions. The vendor cannot insist upon the payment of the price without alleging that he is ready and willing to deliver the goods; the buyer cannot demand the delivery of the goods without alleging that he is ready and willing to pay the price. Benjamin on Sales, § 677.

But it is not necessary to invoke any presumptions in this case to determine the intention of the contracting parties, for the contract by express terms provides that the payment shall be made upon acceptance and delivery. The rule of law quoted by appellants from Kent, that where the terms of sale are agreed upon, and the bargain is struck, there everything that the seller is to do with the goods is complete, and the contract of sale "becomes absolute as between the parties without actual payment or delivery, and the property and the risk of accident to the goods vests in the buyer," and he is entitled to the goods on the payment or tender of the price, and not otherwise, when nothing is said at the sale of the time of the delivery,

or of the time of the payment, does not sustain appellants' position here, for in this contract something *was* said as to the time of payment. And all the cases that have been decided on appellants' theory have been on the supposition of credit, express or implied, or have failed to distinguish the different senses in which the word "delivered" is used. "For," says Mr. Kent (2 Com. 492), "the payment or tender of the price is, in such cases, a condition precedent implied in the contract of sale; and the buyer cannot take the goods, or sue for them, without payment; for, though the vendee acquires a right of property by the contract of sale, he does not acquire a right of possession of the goods until he pays or tenders the price." We think there can be no doubt but that this is and should be the established law. There can be no good reason assigned why the vendor should be compelled to part with any of his rights, including the right of possession, until the vendee performs all the conditions of his contract, especially where the performance of the reciprocal conditions are made concurrent by the plain terms of the contract.

Appellant complains of instructions numbers seven and nine, for the reason that they take from the jury the question of waiver. We are unable to find any testimony in the record tending to show a waiver on the part of the respondent. On the other hand, the testimony of both plaintiff and defendant shows conclusively that Johnson was all the time demanding the payment as a condition precedent to Meeker's agent assuming control of the hops; that he exhibited the contract, and pointed out to Lowry especially the fact that the hops were to be paid for on their acceptance, and positively refused to allow the agent to assume control of them. The fact that he helped to put them in the car prepared by the respondent cannot be construed as any waiver of right of possession, for they had to be placed somewhere when they were weighed and inspected, and the

putting in the car indicated no more intention of a waiver than would be the putting of them into a warehouse provided by respondent. This was simply the fulfillment of his part of the contract, and must not be construed to deprive him of the right of possession, for he had a right to presume that when they were delivered in the place indicated by the vendee that he would receive his pay; and, from all the testimony, he demanded his pay and persistently and all the time refused to allow the agent of appellants to assume control of the hops until the money was paid; and the agent understood his demand and agreed to try to get the money for him. The fact that he extended the time cannot be taken against him. That was simply so many hours of grace that he extended to the vendee, and otherwise did not change their relations at all. There is no evidence of waiver here that would have supported a verdict had an instruction on that question been given, so that appellants cannot be injured for want of such instruction.

It is also contended that the vendee was not given a reasonable time to procure the money to make the payment after the delivery of the goods, but even if the question of reasonable time could be considered at all in an executory contract, where the time for payment was specified in the contract, and no provision made in the contract for notice, yet that question was submitted to the jury under instructions that were favorable to the plaintiff, and the jury have passed upon that proposition, and this court is not authorized to disturb their findings. We think the instructions as given by the court substantially stated the law; and that the instructions asked for by appellants, where they had not already been given in substance by the court, did not properly present the law.

For error alleged in the verdict the judgment is reversed, and the cause remanded for a new trial.

Anders, C. J., and Scott, J., concur.

STILES, J.—I concur in the disposition of this case, but am unable to agree that the ninth charge of the court below was a correct one.

This contract did not expire until Monday, October 20th, and each party had all of that day to fulfill it in if it should be reasonably necessary. Johnson waited until the 15th before he commenced to haul his hops to the railroad station for acceptance, delivery and payment; and, according to his own testimony, he did not then or at any other time fix any time when he would be ready to deliver. On the 16th it rained, and he hauled none. On the 17th he hauled three loads which were the balance of his crop. When he got through neither he nor Meeker & Co.'s agent knew the weight of the hops. While a witness, and on his cross examination, Johnson testified:

"Q. You had no particular conversation with Mr. Lowry at that time (the 15th) did you? A. I talked with Mr. Lowry, but I do not know that I had any particular conversation with him about the hops. Of course we talked somewhat about the hops, and about there being other hops there, and the like, but I could not say as to what other conversations I had with him. We talked, of course, about these things.

"Q. But was there no conversation about how long it would take you to haul your hops, or anything of that sort? A. Oh, no, I don't remember anything of the kind. He knew how much I could haul. (Nothing was said about how much there was to haul.) On the 16th he was not there at all."

After stating that he hauled these three loads on the 17th, he was asked:

"Q. Did you have any conversation with Mr. Lowry on that day? A. We had no more than the general conversation that I recollect of.

"Q. In that conversation was there anything said about when you would be through hauling your hops? A. Yes, sir. I told him I was *through* on the 17th.

"Q. What did he say? A. He said for me to come the next day, the next morning, and he would fix up the hops, and I went the next morning, and we fixed them up."

The "fixing up" comprised weighing, inspection and loading into the car, which was not finished until about half-past three in the afternoon of Saturday. Immediately Johnson demanded his money, and threatened to claim the hops unless forthwith paid. Lowry had no money, and could not procure it except by telegraphing to Puyallup, or going to Chehalis. The wires were down, so that Puyallup could not be reached; and, after several ineffectual attempts to telegraph, Johnson said he would only wait until twelve o'clock, midnight, for the money—in the meantime he would go home. He went home and did not return until Monday. On Monday morning, before he had touched the hops, the full amount of their price was tendered to him in gold coin. It is perfectly evident that Johnson supposed that the contract expired at midnight of Saturday, he being under the mistaken impression that a contract running from the 20th of September to the 20th of October expired at midnight on the 19th of October, and that the 19th being Sunday, Saturday was the last day; and that he was allowing time to the last hour required by his contract for the other side to carry it out. Under these circumstances the court, after charging the jury that the appellants were not required to keep two thousand dollars at Napavine for a whole month to meet the contract, but that they must have notice of intention to deliver, and reasonable time thereafter in which to pay the money, further charged them that if the hops were delivered on Saturday, after notice that they would be delivered on that day, and if the notice was sufficient to have enabled Meeker & Co. to make preparation for payment at the time of delivery, then they should have been prepared, and if they were not prepared they ought not to recover.

Without doubt it was upon this charge that the jury returned their verdict for the defendant. But it was, in my view, an erroneous charge, because, as I have shown by reciting the defendant's own testimony, there was no proof of any notice whatever which ought to have charged the appellants. Admitting that what Johnson said to Lowry previous to Saturday was notice that on that day he would be ready to proceed with the weighing and inspection, it could not be taken as notice of anything further, because neither of them could know until after the weighing how many pounds there were, or how much money would have to be paid. The appellants were bound to take the entire crop, which the contract estimated at ten thousand pounds, whether it made thousands of pounds more or less. Now the charge of the court and the decision here is, that when Johnson began to haul his hops, or at least on Friday, when he told Lowry that he had finished hauling, it was then the duty of Meeker & Co. to set about getting and to have on hand the indefinite large sum which would be required to pay Johnson the moment the weight was ascertained; or, in other words, that they must be ready on the instant to perform a contract, two of the most important terms of which, the weight and the price, could not be known by either party until that instant had arrived. I do not think any business man should be held to such a rule, nor do I find that any court has ever so held.

It is said that the terms of the contract called for cash on delivery, and I concede that. But cash on delivery, where one party has taken until what he thinks to be the very last day of a thirty days' option to make his tender of the goods, does not mean that the other party shall have no consideration. I hold that after the weight and price had been ascertained at 4 oclock Saturday afternoon, appellants were entitled to a reasonable time in which to tender their money, and that when they did so Monday forenoon

the title and right of possession passed to them. It was shown that there was no bank in Napavine, and no place of reasonable safety for the keeping of so large an amount of money, nor any place nearer than Chehalis, nine miles away; and beside that, the hour at which the amount to be paid was ascertained was too late to get money on that day from any bank. That a reasonable time to procure the money must be allowed in such cases, I cite: Benjamin on Sales, § 708; 2 Schouler, Pers. Prop., § 306; *Blackwell v. Fosters*, 1 Metc. (Ky.) 88; *Furlong v. Barnes*, 8 R. I. 226. And that a tender of the price before the seller re-sells his goods passes the title, I further cite *Martindale v. Smith*, 1 Q. B. 389, which is the leading case in England, and has been followed there since 1841. Smith, on the 23d day of April, sold Martindale six stacks of oats, to be paid for July 10th, the stacks to remain, if required, until August. Smith, in the beginning of July, told Martindale that if he did not pay on the very day he should not have the oats. Martindale did not pay then, but two or three days afterward he tendered the price. Smith still had the oats in his possession, but refused to take the money, and afterwards sold the oats. It was held that trover would lie because "the vendor's right to detain the thing sold against the purchaser must be considered as a right of lien till the price is paid, and not a right to rescind the bargain, and here the lien was gone by tender of the price." Overton on Liens, §§ 191–206; Benjamin on Sales (Corbin's ed.), § 1157; 2 Schouler, Pers. Prop. §§ 557–566.

The respondent went away to his home on Saturday evening, leaving the hops in the care of appellants. At whose risk were they there in case of fire? Had they been destroyed before Monday there cannot be much doubt what respondent's attitude would have been. He left Napavine intending to allow until the end of the time fixed by the contract for the payment, and supposing that he had done

so, although he named midnight of Saturday as the limit; and he left the hops in the constructive possession of the appellants.  On Monday he made no attempt to take the hops from the car until after the tender, and after he had offered to let them go for $900 more, although both parties agreed that they were worth at that time more than $3,500.  The majority opinion decides that although a reasonable time must be allowed in such cases the court below submitted the question of reasonable time to the jury, who found on that question for the respondent.  The submission to the jury was only of the question whether there was reasonable notice beforehand, not whether a reasonable time was allowed after the terms of the contract had been ascertained, in which there were two errors involved in one. For if anything on that subject were submitted, both the antecedent notice and the subsequent reasonable time should have been so treated.  But it was error to submit the question to the jury at all.  The facts were clear, plain and undisputed, and came straight from the testimony of the respondent himself, in which case the reasonableness of the notice even was for the court and not for the jury, who should have been told that, such a state of facts being established, their finding should be for the plaintiffs.  *Blackwell v. Fosters*, 1 Metc. (Ky.) 88; *Hill v. Hobart*, 16 Me. 169; *Howe v. Huntington*,  15 Me. 350; *Joy v. Sears*, 9 Pick. 6.

Hoyt, J., concurs.