[No. 12028.   Department One.   January 6, 1915.]

NORTH IDAHO GRAIN COMPANY, LIMITED, *Respondent*, v.
I. P. CALLISON, *Appellant*.[1]

SALES — EXECUTORY OR EXECUTED—INTENT—"SOLD." Whether a sale is executed or executory will depend on the intent of the parties, and the use of the word "sold" is not conclusive when other conditions in the contract indicate a different intention.

SAME—EXECUTED SALE—EXISTENCE OF PROPERTY—POSSESSION OF VENDOR—PRESUMPTIONS. There can be no valid executed sale unless the thing sold has an actual or potential existence at the time of the sale; and if the property is to be acquired by the vendor, it is *prima facie* an executory contract.

SAME—EXECUTED OR EXECUTORY CONTRACT — EVIDENCE — SUFFICIENCY. An accepted offer of two hundred tons of number one timothy hay is not an executed contract for the sale of the hay, on which an action for the contract price will lie, but only an executory contract for breach of which the vendee is liable only for damages for loss of profits, where the vendor did not have the hay at the time of the sale, and in buying hay to fill the order did not set aside and appropriate a specific lot of hay and hold it subject to the contract; but after getting together part of the hay, reappropriated and converted it to the vendor's own use, expecting to substitute hay from the next year's crop.

SAME—EFFECT OF INSURANCE—EVIDENCE—SUFFICIENCY. In such a case, the nature of the contract is not affected by the fact that the vendee directed insurance to be carried, where the direction was made at a time when the vendee believed the hay had been purchased and specifically assigned to its account, whereas it was part of a common mass, and the insurance was not in the vendee's name, but a blanket policy covered all of the vendor's hay.

ELECTION OF REMEDIES—INCONSISTENT REMEDIES—SALES CONTRACT. A vendor, having adopted the theory of an executed sale and sued for the price due, cannot recover for loss of profits on the theory of a breach by the vendee of an executory contract of sale.

Appeal from a judgment of the superior court for Chehalis county, Irwin, J., entered December 27, 1913, upon findings in favor of the plaintiff, in an action on contract, tried to the court.   Reversed.

[1]Reported in 145 Pac. 232.

*John C. Hogan* and *A. E. Graham,* for appellant.

*Bridges & Bruener* and *Glen Snider,* for respondent.

CHADWICK, J.—Plaintiff brought this action to recover the balance of the purchase price due under a contract for the sale of two hundred tons of No. 1 timothy hay. Plaintiff was a wholesale dealer in hay at various points in the state of Idaho and defendant is a dealer in the same commodity at Aberdeen, in this state.

The contract of the parties is evidenced by correspondence, the offer and acceptance being as follows:

"North Idaho Grain Co.,                    Sept. 2nd, 1910.
    "Deary, Idaho.
Gentlemen: Replying to your letter of the 27th, we will take 200 tons of number one timothy at $20.75 f. o. b. points between Palouse and St. Maries on the W. I. & M. road. Please wire acceptance of this order. Yours very truly, (Signed) Chehalis Produce Co. by I. P. Callison."

"Chehalis Produce Co.           Deary, Idaho, Sept. 5.
    "Aberdeen.   Accept offer two hundred tons timothy, yours second.   (Signed) North Idaho Grain Co."

The telegram accepting defendant's offer was followed by a letter of even date as follows:

"Messrs:   We wired you as follows: 'Accept offer two hundred tons timothy.   Yours second.'   This telegram was in reply to your letter of the 2nd inst., and covers 200 tons of No. 1 timothy at a uniform price of $20.75 f. o. b. points on the Washington, Idaho & Montana Ry. taking Palouse rate, viz. $3.85 per ton to coast terminals.   These shipments will come to you from Palouse, Wellesley, Potlatch, Harvard and Deary, possible Princeton.

"We were genuinely pleased to receive this order and as soon as you give us shipping instructions, we will begin loading.   All of these shipments must come via the Washington, Idaho & Montana and the Chicago, Milwaukee & Puget Sound and will be so routed and loaded into Milwaukee cars.

"Awaiting your instructions and assuring you that we will give your orders prompt attention, we are, Yours very

truly, (Signed) North Idaho Grain Co., Ltd., By F. C. McGowan."

To which defendant made reply as follows:

"Gentlemen: We are in receipt of your letter of the 5th confirming sale to us of 200 tons of number one timothy at $20.75 f. o. b. points on the W. I. & M. Road taking the same rate as Palouse. Just at the moment we are flooded with hay but will be able to hand you shipping instructions on a part of the order in a few days. Yours very truly, (Signed) Chehalis Produce Co. By I. P. Callison."

After the contract was entered into, defendant wrote to respondent that he had found that he could not ship the hay to Grays Harbor without transferring it at Tacoma from the Milwaukee railroad to the Northern Pacific railroad, which would involve a cost of 50c extra, and that there would be more delay in shipping the hay than he expected. Plaintiff responded:

"We will send you warehouse receipts attached to a draft for 90% of the f. o. b. value if this will be satisfactory to you and will ship out as per your instructions."

Pending an answer, plaintiff wrote to defendant, saying:

"We will be willing to keep the hay in our warehouse without storage charges until ninety days after the date of contract. If it cannot be moved at that time we will consider extending free storage until January 1st. The matter of interest, however, is a considerable item to small shippers like ourselves and inasmuch as you have not accepted our suggestion that we draw on you through your bankers for ninety per cent of the selling price we offer the following method of handling it, viz,, we will charge you on ninety per cent of the total hay sold, interest at the rate of eight per cent and will include this interest in the invoice when hay is ordered out. This of course to be in addition to the insurance which we are continuing on the hay. Although you have not advised us to do this we have deemed that you would want this protection. We trust you will find these suggestions in order and remain, Yours very truly, North Idaho Grain Co., By F. C. McGowan, EL."

On November 7, defendant wrote to plaintiff as follows:

"Referring again to your letter of the 14th, in regard to our contract with you, we beg to submit the following arrangements:

"We will pay you 8% interest on 90% of the amount of the purchase price of the hay, interest to be computed from the 1st day of November, up to the date of the date of the shipment of each car.

"Insurance up to $3,500.00 is to be carried by you for us, at the rate of 80 cents per $100.00, dating from November 1st and expiring as the hay is shipped, this insurance to be charged to us.

"We are to have free storage on the hay up to March 1st, and to pay storage at the rate of 10 cents per ton per month on all hay carried beyond that date.

"The interest, insurance and accrued storage on each car of hay is to be included in your invoice as the hay is shipped out.

"We are asking free storage on account of the fact that the hay was bought by us through a misunderstanding of the freight arrangements over the Milwaukee Road. Since this purchase we have withdrawn from your territory and have made no effort to purchase hay up that line. As a result you have no doubt been able to secure hay to fill the order at a very favorable figure. Yours truly, Chehalis Produce Co., By I. P. C."

On the 10th of November plaintiff replied:

"We have your letter of the 7th and note what you say about our having been able to purchase the hay at a very favorable figure. We wish that this might have been the case, but unfortunately we expected you to give shipping orders at once on this purchase, and we therefore proceeded at once to buy sufficient to cover our contract. This high priced hay, we still have, as it was necessary to pay a price above the market at that time in order to get it. And our interest on the money used to buy it is still being paid to the banks where our loans are obtained.

"The paragraph of your letter regarding insurance we will accept as an agreement. This means, however, that we carry it during the month of October for nothing.

"We will agree to grant free storage until Feb. 1st, as hay ought to be moving by that date if it is going to move at all.

"Although we began paying interest on the money put into this hay on September 10th, we will waive the 20 remaining days of that month, but we think we are entitled to 8% interest on 90 per cent on the entire purchase price from sixty days thereafter, or from Dec. 1st.

"We appreciate the hay conditions at the present time, and have tried to modify your offers as little as possible. The margin you would have left us would have been insufficient to let us out whole, and we trust our counter-proposition will be acceptable to you. We are, Yours very truly, North Idaho Grain Co., By F. C. McGowan."

There seems to have been no further correspondence until in January, 1911, when negotiations for a settlement were instituted. On March 24, plaintiff wrote:

"The writer has just returned from a trip to Wisconsin and Eastern points. Having been away about five weeks, we feel that we are a little out of touch with market conditions and consequently write you to know what the possibilities of shipping your hay to you are going to be within the next thirty days. We have been looking over your contract letter of Nov. 14th and note that the free storage period ceased on March 1st and as it may now be possible for you to receive this hay, putting it into your own warehouses, we deem it advisable to write you in order to call this matter to your attention. . . . Yours very truly, North Idaho Grain Co., by F. C. McGowan."

Receiving no reply to this letter, plaintiff wired defendant:

"Chehalis Produce Co.,      Deary, Idaho, May 17, 1911.

"Aberdeen, Wash. Have had no reply to our letter of the 13th. We desire to move this hay at once and are therefore anxious to hear from you. We await your reply. North Idaho Grain Co."

Defendant replied:

"Aberdeen, Wash., May 18, 1911.

"North Idaho Grain Co.

"Deary, Idaho. Gentlemen: We consider our hay contract cancelled. Our previous offer was withdrawn when you

refused to accept and the contract time for delivery is now past. Yours truly, Chehalis Produce Company, By I. P. C."

No hay was ever shipped under the contract. In August, 1911, plaintiff began an action in the courts of Idaho and attached 150 tons of hay, more or less, in the Wellesley warehouse and either 73 or 71 tons in the Potlatch warehouse. This was sold and bought in by McGowan, the manager of the plaintiff, for the sum of $1,000. After deducting costs, the balance remaining was applied on the purchase price.

This suit was begun in the superior court in and for Chehalis county to recover the balance alleged to be due.

The lower court found that there had been a present sale; that title had passed to the defendant, and that no part of the purchase price had been paid other than the credit realized from the net proceeds of the sale. Judgment was rendered for the balance due, with interest, costs, etc.

It is the contention of the defendant that the transaction was no more than an executory contract to purchase the hay, or an option revocable at any time before it was executed by delivery, which, under the custom of the trade, was at Aberdeen, Washington, and plaintiff's remedy, if any, was an action for damages for the loss of its bargain. Both parties accept the case of *Lauber v. Johnston*, 54 Wash. 59, 102 Pac. 893, as a correct statement of the law, that is:

"The question as to when the title to personal property passes to a vendee under and in pursuance of a contract of sale, depends upon the intention of the parties. Whether the contract is executed or executory must be determined by its terms and purposes, the nature, conditions and situation of the property sold and the circumstances surrounding the parties."

See, also, *Meeker v. Johnson*, 3 Wash. 247, 28 Pac. 542; *Pacific Lounge & Mattress Co. v. Rudebeck*, 15 Wash. 336, 46 Pac. 392; *Pacific Coast Elevator Co. v. Bravinder*, 14 Wash. 315, 44 Pac. 544. It will be necessary to make particular reference to the facts when discussing the law of the

case and we shall not therefore undertake a further or con-
nected statement.

To sustain the judgment of the trial judge, plaintiff de-
pends upon the following propositions: First: The con-
tract by its terms is a present sale; second: The concomitant
circumstances,—(a) the purchase of the hay by it to fill the
contract; (b) the piling of the hay in separate piles to be
shipped on order; (c) the insurance of the hay at defend-
ant's request.

Whether a sale is executed or executory, will be resolved
by reference to the real intent and purpose of the parties.
Authorities might be multiplied, but it will be unnecessary to
go beyond the decisions of this court. In *Meeker v. Johnson*,
the contract was in writing, the words of transfer being,
"Sell, transfer and set over." In commenting on the case of
*Arkansas Valley Land & Cattle Co. v. Mann*, 130 U. S. 69,
Judge Dunbar, who wrote the opinion of the court, said:

"It is true that the formal word "sold" is used in this con-
tract, as in that; but so it is in a great majority of contracts
of this kind where it is not claimed by either party that they
are anything more than executory contracts. This may be,
and doubtless is, one expression among others, to indicate
the intention of the parties; but it is only one, and is not
conclusive when the other conditions in the contract indicate
a different intention. It is a legal conclusion, rather than a
statement of fact."

In the *Pacific Coast Elevator Co.* case, there was a written
contract, the apt words being, "The Pacific Coast Elevator
Company agrees and hereby sells to Bravinder & Keats,
1,500 bu. of wheat, etc." The court considered all the facts
of the case and held,

"that the evident intention of the parties under this con-
tract was not that it constituted a present sale, for the plain-
tiff was to segregate and weigh or measure the amount agreed
to be sold, and was bound to deliver merchantable wheat."

In *North Pacific Lumber & Mfg. Co. v. Kerron*, 5 Wash.
214, 31 Pac. 595, the apt words were, "do by these presents,

grant, bargain, sell and convey." It was held, in the light of all the facts, that these words were not conclusive.

The apt words in the cases cited are even more strict than the words employed by the parties in the case at bar. It will be remembered that when plaintiff offered hay at a certain price, defendant said: "We will take 200 tons of number one timothy &c," to which plaintiff replied, "Accept offer two hundred tons timothy." Both parties have filed exhaustive briefs and cited authority *ad libitum*, but it seems to us, that, being bound to consider the case in the light of its own facts, no real service would be performed by reviewing and commenting upon the authorities. The case may be resolved by reference to well settled and certain fundamental principles. For this reason, then, we will not undertake to follow counsel in their excursions into the vast realm of the law of sales.

It is a fundamental principle that, in every completed sale, the title to the thing sold passes to the purchaser. There is "a transmutation of property from one man to another in consideration of some price or recompense in value." 2 Blackstone's Com., 446. This being so, all authorities concur in laying down the rule that there can be no valid executed sale unless the thing sold has either an actual or potential existence at the time of the sale. That is to say, it must actually exist and be in the possession or under the control of the vendor, or it must come out of something that is in his possession or under his control, as for instance, growing crops, goods in the process of manufacture, the increase of cattle and the like. As said by Chancellor Kent, the property must be "specific, or defined and capable of delivery, otherwise it is not strictly a sale but a special or executory agreement." 2 Kent Commentaries (14th ed.), 468; 1 Chitty, Contracts (9th ed.), 517; Parsons, Contracts (9th ed.) page *521.

"Neither the rule itself, nor the reason on which it is founded, has any application to an executory agreement for future sales." *Whitehead v. Root*, 2 Met. (Ky.) 584.

The question then, notwithstanding the words of the contract is, What did the parties intend?

"This intention must be found evidenced in some way other than by the words used in the instrument or by the surroundings of the parties stated in the petition." *House v. Faulkner*, 61 Tex. 308.

The contract to be construed was for the sale of goods not then in the possession of, but to be acquired by, the plaintiff, and is *prima facie* an executory contract for the sale of personal property. The title in the hay would not pass to the vendee until the vendor, after it had acquired the hay, did some act appropriating it to the contract. As for instance, piling it away or setting it apart pending shipment, or by marking or branding it. 2 Kent's Commentaries, 496; 1 Chitty, Contracts (11th Am. ed.), 524; *Langton v. Higgins*, 4 H. & N. (Eng. Exch. Rep.), 402.

We have examined the record in this case with some care, and are convinced that, while there are some circumstances that might, if standing alone, be sufficient to sustain a judgment in favor of plaintiff, when considered in the light of all the evidence, they cannot be held to be controlling.

In the first place, we find, contrary to the holding of the trial judge, that plaintiff has not sustained its contention by a preponderance of the evidence that it did receive and pile separately a specific lot of hay and hold it subject to the contract; or that it had, at any time when it might be called upon to make delivery under the contract, No. 1 hay in sufficient quantity to fill its contract. The most that can be claimed for plaintiff is that it was engaged in the business of buying and selling hay; that it entered into a contract to deliver a specific quantity of a given quality and it believed itself to be prepared to deliver when called upon to do so. Plaintiff's manager says:

"Q. I presume when you purchased hay from a rancher at the time this hay was piled you would try to segregate the number one and two hay. A. If there was a bale or two

we wouldn't but if it amounted to five or six bales we would because it would make a mixture. . . . Q. You say when that hay was taken in there was an endeavor made to separate the number one hay from the number two hay? A. We always do that. Q. You say if it is only a matter of two or three bales you didn't mind it? A. They might go into number one. Q. If it is a matter of seven or eight bales they would separate it? A. That is correct. Q. In doing that they were just aiming generally to put the number one in one place in the warehouse and the number two in another place? They wasn't grading it for shipping purposes? A. No, because you wouldn't get (all) that was put in, say you seen three sides of it and on the other side some stubble sticking out, you might see that when you would load it and spot it out. Q. When you come to grade for purpose of shipment? A. On a weak market you have to. On a strong market it isn't usually the custom. Q. You say at first you began to pile hay in the west end of the Wellesley warehouse? A. Yes, sir. Q. And later as the warehouse got more hay in it you piled it over the warehouse generally? A. Yes, sir. Q. And it was all one mass? A. It was together. Q. All together? A. Yes. . . . . Q. You considered you had a right to give him hay out of any of these warehouses? A. I considered I had just as much right to give him two hundred tons of number one hay anywhere along that line. Q. In or out of any of these warehouses? A. Yes, sir, that is according to the contract."

On the other hand, it seems to us that the defendant has proved, by a preponderance of the evidence, that there was not 200 tons or 150 or even 129 tons (the amount finally weighed out) of number one hay in the Wellesley warehouse, where plaintiff undertook to attach the residue of its holding and estimated the lot at 150 tons more or less.

It is unnecessary to go into the testimony of the witnesses. It is enough to say that it preponderates in favor of the defendant.

It is shown, also, that some of the hay which plaintiff now claims to have passed under the contract to defendant at the time of the sale in virtue of the subsequent buying and

alleged segregation, was not purchased until the spring of 1911. This, coupled with plaintiff's letter of May 18th, written in response to the suggestion that it did not have hay in quantity and quality to fill its contract, that it could supply 150 tons of No. 1 hay and 50 tons that would not be docked more than $1 per ton, is in itself enough to overcome plaintiff's theory of an executed sale of a specific lot of 200 tons of hay, purchased, set aside and held, for the defendant. Moreover, it appears that in July, 1911, one Miller, plaintiff's successor, wanted the hay then stored in the Potlatch warehouse, and which it is now insisted was held as the property of the defendant, to make up a shipment of his own. Plaintiff's manager allowed him to take it upon the promise of substitution. Miller replaced the hay out of the 1911 crop. It was the new hay or the Miller hay in the Potlatch warehouse that was attached and sold. By no stretch of the imagination can it be held that specific property sold, segregated and held for shipment to another can be otherwise disposed of and hay of another crop substituted therefor, except it be on the theory of an executory sale and the holding of the vendor in readiness to deliver hay of the kind and quality upon demand. Furthermore, hay that is alleged to have been sold was made the subject of a pledge by the plaintiff to its bank. It remained subject to plaintiff's debt from September 4, 1910, to April 4, 1911. Plaintiff bought and sold, pledged and loaned its stock of hay without reference to its contract with defendant, apparently assuming that it would have enough of the old crop, or, if that were gone, enough of the new crop, or the hay Miller was to return, to deliver 200 tons.

The conduct of the plaintiff is entirely inconsistent with its present theory. That the plaintiff regarded the contract as executory is more clearly indicated. When the sheriff went to attach the hay in the action instituted by plaintiff in the courts of Idaho, plaintiff had no particular hay in any particular warehouse in mind; but at the suggestion of

the sheriff permitted him to attach the hay in the Wellesley and Potlatch houses, they being more convenient and closer to the sheriff's center of activity than the other houses.

It is elementary that a vendor cannot maintain an action for the purchase price of goods sold unless, at the time the contract calls for delivery, or at the time when he ought to make delivery, he has the goods and is ready and able to deliver them. 35 Cyc. 531.

"Under the contract of sale, the delivery of the iron and the payment of the money, were things to be done at one and the same time. The plaintiffs were not bound to deliver the iron, unless the defendants at the same time paid the money; and the defendants were not bound to pay the price unless the plaintiff at the same time delivered the thing sold, or was ready to deliver it. The obligations to deliver on the one part and to pay on the other, were mutual and dependent. If the buyer in a case of this sort fails to pay or offer to pay within the time specified for mutual performance, the seller is discharged from liability to answer in damages for not delivering the thing sold. But it does not follow that the seller, in such case, is entitled from the mere default of the buyer, to recover the purchase money. To entitle the seller to recover the price, he must show not only that the purchaser failed to pay, but that he himself was ready and offered to deliver the goods." *Dunham v. Mann*, 4 Seld. (N. Y.) 508.

The record is entirely bare of sufficient facts to sustain plaintiff's theory to sustain the judgment upon this feature of the case. As we have shown, plaintiff, if it had ever set apart 71 or 73 tons of hay which it claims to have had in the Potlatch house, reappropriated and converted the hay to its own use when it allowed Miller to take it and ship it. We have, therefore, so far as this case is concerned, the hay remaining in the Wellesley warehouse and which was attached as 150 tons more or less, but which it is admitted weighed out only 129 tons, for the contract to operate upon. It follows that, plaintiff being in no position to make delivery at the time it assumed to make constructive delivery by

levying an attachment on the amount of hay it claims to have sold to the defendant, it cannot recover; for while defendant might on his side be willing to take less than the whole, plaintiff cannot, either actually or constructively, compel him to do so.

But it is said that the direction to insure the hay was an acceptance and an agreement that the contract was a present sale. This at best is but one circumstance, and as said by Judge Dunbar in the *Meeker* case, will not be considered to the exclusion of others. In arriving at the intent of the parties we must place ourselves in the position occupied by them. This direction was made at a time when defendant believed that the hay had been purchased and specifically assigned to its account, whereas in fact the hay had not been purchased and held for defendant's account but was a part of a common mass out of which plaintiff assumed to make delivery upon call. Neither was the hay insured for defendant or in defendant's name. It was at that very time insured under a blanket contract covering all of the warehouses. One thing is certain, defendant could not have collected on the contract of insurance if there had been a loss. The insurance had been taken out and was carried for plaintiff's benefit.

Warehouse cases holding that a vendor has a right to supply grain, hay, and like commodities out of a common mass are cited and relied on. Admitting, but not deciding, that the rule applies to baled hay bought under a specific contract, plaintiff itself adopted the theory of a purchase and holding of a specific lot. Plaintiff might have adopted the theory of an executory sale and brought an action for damages. Having adopted the one theory, it cannot now claim the benefit of the other or take from defendant the legal benefit flowing from its conduct.

Other questions are raised by counsel on both sides. Believing, however, that the sale was not an executed sale, or, if executed, that the plaintiff reappropriated and converted

the property to the extent that it was not in position to deliver at the time it assumed to deliver, it will not be necessary to pass upon them.

Reversed and remanded with instructions to dismiss.

CROW, C. J., PARKER, MORRIS, and GOSE, JJ., concur.