[No. 550.   Decided February 14, 1893.]

EZRA MEEKER AND FRED MEEKER, *Appellants*, v. IRA
JOHNSON, *Respondent*.

### SALE — TITLE DEPENDENT ON PAYMENT — RESCISSION.

Where a contract provides for payment for a certain hop crop
upon its delivery to, and acceptance by, the purchaser between cer-
tain dates, the seller is entitled, upon the failure of the purchaser
to pay the stipulated price at the time of delivery and acceptance,
to rescind the contract, and such right of rescission is not defeated
by tender made on a day subsequent to the purchaser's default.
(STILES and HOYT, JJ., dissent.)

*Appeal from Superior Court, Lewis County.*

*Pritchard, Stevens, Grosscup & Seymour*, and *Reynolds
& Stewart*, for appellants.

*Herren & Elliott*, for respondent.

The opinion of the court was delivered by

ANDERS, J.— On August 9, 1890, the plaintiffs and the
defendant entered into the following contract in writing:

"This agreement, made and entered into this ninth day
of August, 1890, by and between Ira Johnson, of Napa-
vine, county of Lewis and State of Washington, party of
the first part, and E. Meeker and Company, of Puyallup,
in the county of Pierce, State of Washington, parties of
the second part:

"Witnesseth, That the said party of the first part, for
the consideration hereinafter named, has sold, transferred
and set over, and by these presents does sell, transfer and
set over unto said parties of the second part, their heirs
and assigns, and agree to deliver to said parties of the sec-
ond part, between the twentieth day of September, 1890,
and the twentieth day of October, 1890, at the Northern
Pacific railway station at Napavine, 10,000, more or less,
being the entire crop of hops of the growth of the year
1890, more particularly described as ten thousand pounds

of hops belonging to the said party of the first part and now growing upon his own farm near Napavine.

"The said party of the first part further agrees to complete the cultivation of said hops and in due season to pick, cure and bale the same in bales of about 180 pounds each, 71 pounds per bale allowed as tare, or 200 pounds, and at the same time and place above specified to deliver the same, of strictly choice quality, of even color, well and cleanly picked, and thoroughly cured, but not high dried.

"In consideration whereof, the said parties of the second part agree to pay said party of the first part the sum of twenty cents per pound for said hops, as follows, to wit: ……… cents per pound, being the sum of …………… dollars upon execution of said contract, the receipt of which sum is hereby acknowledged by said party of the first part; ……… cents per pound, being the sum of …………… dollars, for picking purposes on demand after the ……… day of September, 18……; twenty cents per pound, or the balance that may be due upon said hops, upon delivery and acceptance of the same by said parties of the second part.

"It is further agreed that said party of the first part shall keep said hops insured from the time the same are picked until they are delivered, in a sum equal to all advance that shall have been made by said parties of the second part.   Above insurance is not necessary unless part payment is made before delivery of hops."

On the 15th day of October, 1890, in pursuance of his agreement, Johnson commenced hauling his hops to the station at Napavine.   He hauled but two loads on that day, for the reason that no more could be put into the warehouse where they were to be delivered until plaintiffs' agent, Mr. Lowry, removed other hops which were then in the warehouse, and which were not removed until late in the evening.   The next day it rained and no hops could be hauled.   On the following day, the 17th of October, he placed the remainder of his crop of hops in the warehouse and so notified Lowry.   At the latter's request Johnson went to Napavine the next morning, which was Saturday, for the purpose of assisting in the weighing and inspection

of the hops.　After they were inspected and weighed, they were placed in a railroad car provided for that purpose by the plaintiffs.　It was about three or half-past three o'clock in the afternoon when they finished weighing and putting the hops into the car.　The entire weight of the hops was then ascertained and their value at the contract price agreed upon.　Immediately thereafter a conversation occurred between Mr. Lowry, plaintiffs' agent, and the defendant, as to which there is practically no controversy.　As to what was then said the defendant Johnson testified:

"I asked Mr. Lowry if these hops filled the bill and he said they did; said the hops were all right.　I asked what he was going to do with them and he said he was going to send them to Puyallup to Mr. Meeker, and I put my hand into my pocket and took out my contract and said my contract called for cash on delivery or acceptance, and I called Mr. Keys, the station man there, as a witness, and demanded my money, and told him that if he did not pay me that day, that I would give him the balance of that day to pay me, and if he did not pay me, the hops were mine and I should take them out of the car."

To this Mr. Lowry replied:

"I haven't the money here, Mr. Johnson, but I will send the returns to Mr. Meeker and the money will be sent to you.　He replied: 'If the money is not paid by 12 o'clock to-night I will take the hops out of the car.'　I said I could not help it, but would telegraph to Mr. Meeker and see what I could do about it."

During the course of the conversation in regard to the payment for the hops, Lowry told Johnson that he would guarantee that the hops would not leave the station until his money was paid.　Lowry attempted to telegraph to his principals at Puyallup in regard to the condition of affairs, but the wires being down he was unable to reach them.　Johnson "fastened up" the car containing the hops and went home, and did not return until Monday. Lowry took the first train which left Napavine, about 5

o'clock in the afternoon, and went to Chehalis (nine miles distant), where the nearest bank was situated, and from there telegraphed to Meeker.  When he arrived at Chehalis Saturday evening the bank was closed.

On Monday morning he returned to Napavine by the earliest train from Chehalis, arriving there about 11 o'clock. He at once met Johnson and offered to pay him the full value of the hops in gold coin.   Johnson declined to accept the money, claiming that the plaintiffs had violated their contract, and sometime during the afternoon removed the hops from the car with the knowledge of and without any objection from Lowry, and placed them in a building belonging to one Urkhart, where they remained until taken by the sheriff and delivered to the plaintiffs by virtue of process regularly issued in this action.

This is the second time this case has been before this court, and the facts disclosed in the record are substantially the same facts which were presented on the former appeal.   And the learned counsel for the appellants have not discussed certain questions which they considered decided on the first appeal, and which are therefore not now subject to reëxamination.   It is the settled law of this case that the title to the hops in question did not vest in the plaintiffs on the execution of the contract, nor even when they were accepted and placed in the car, and, also, that the defendant did not waive the right of possession by extending the time of payment until midnight of the day on which the hops were delivered.   See *Meeker v. Johnson*, 3 Wash. 247 (28 Pac. Rep. 542).

But appellants strenuously insist that this court, at the former trial, decided that they were entitled to a reasonable time for payment after the ascertainment, by weighing and examination, of the amount to be paid under the contract, and that, therefore, the trial court, by refusing the instructions asked by appellants, as well as by the instructions

46—5 WASH.

given on its own motion, erroneously took that question from the consideration of the jury. Turning to the opinion of the court, at page 261, we find this language:

"It is also contended that the vendee was not given a reasonable time to procure the money to make the payment after the delivery of the goods, but even if the question of reasonable time could be considered at all in an executory contract, where the time of payment was specified in the contract, and no provision made in the contract for notice, yet that question was submitted to the jury under instructions that were favorable to the plaintiff, and the jury have passed upon that proposition, and this court is not authorized to disturb their findings."

While the court did not in positive and unequivocal language decide the question, it would seem that the only inference that could be legitimately drawn from what was there said is, that the question of reasonable time for payment should not have been considered at all in the construction of the contract under consideration, but, having been considered and passed upon by the jury, their verdict, under the circumstances, would not be disturbed. But, be that as it may, the real question for us to determine is not whether the appellants were entitled to a reasonable time in which to comply with the terms of their contract, for the time was fixed by the contract itself, but whether they performed, or offered to perform, their part of the agreement according to its substance and spirit. If they were themselves in default it needs no argument or citation of authorities to show that they are not in a position to enforce the contract as against the respondent.

The agreement provided, in legal contemplation, that the respondent might deliver his crop of hops at Napavine on any day between September 20 and October 20, 1890, and that he should be paid for the same on delivery and acceptance by the appellants. And the respondent had a right to presume that appellants, having entered into the

contract, would perform it according' to its terms when the
time of performance arrived.    And, not only that, but he
had a right to insist that they should do so before assuming
to be the owners of the chattels.    The hops having been
delivered at the place designated within the time specified,
and having been examined and found to be of the required
quality, the time had then arrived for the appellants to ful-
fill their part of the contract, which was to accept and pay.
They were, then and there, ready and willing to accept, but
had entirely neglected to make preparation for payment,
although they had agreed that acceptance and payment
should be concurrent acts.

The agent of appellants, at the time he accepted the
goods for his principals, neither paid nor offered to pay
for them.    He told the respondent that he had no money
at Napavine, but would telegraph and see what could be
done about it — that he would send the returns to Mr.
Meeker, who was in another county, and the money would
be sent to him.    Now, under these circumstances, and not-
withstanding the fact that the respondent distinctly told
Mr. Lowry that he could not have the hops if the money
was not paid that day, the appellants claim that they, on
that very same day, became the owners of the hops, and
that the respondent violated his contract of sale by not ac-
cepting a tender of the price made two days thereafter.
And it is argued on behalf of appellants that they were not
in default, because they were entitled to notice of the time
when the hops would be delivered, so that they might be
prepared to make payment when they were accepted, and
that they were entitled to a reasonable time thereafter to
procure the money, and that on Monday was a reasonable
time.

As to the first proposition, it is sufficient to observe that
the testimony shows that Lowry, who was representing ap-
pellants, had notice, on the 15th of October, that the re-

spondent was ready to deliver the hops.   On that day, not only were two loads hauled and put into the warehouse, but Lowry was told by Johnson how many bales he had altogether to deliver.   On the 17th the balance were delivered and Lowry notified of the fact.   Besides, appellants were to pay on delivery and acceptance, and it can hardly be contended that they had no notice of their own acceptance of the hops.   Indeed, under this contract, Johnson was not bound to give notice of performance on his part, for it is a general rule that one who binds himself to do anything on the happening of a particular event is bound to take notice, at his own peril, and to comply with his promise when the event happens.   Benjamin on Sales (Bennett's Notes), § 577 ;  2 Schouler on Personal Property, § 291 ;  5 Lawson's Rights, Remedies and Practice, p. 4151.

In *Keys v. Powell*, 2 A. K. Marsh. 254, it was held that the defendant, who had lost a trunk belonging to the plaintiffs, and who agreed to pay plaintiffs the value of its contents, when ascertained by a certain designated person, was not entitled to notice before suit that the value had been ascertained by said person, for the reason that the defendant's contract showed that he had the means of informing himself of the fact.   And the same principle would apply in this case.   In any event, therefore, appellants are entitled to no immunity on the ground of want of notice.

Nor do we think that the claim that they were entitled to reasonable time, in the sense contended for, is sustained by the authorities cited, when applied to the facts of this case.   The case cited in § 708, Benjamin on Sales (1888), is not in point.   There was there no rescission of the contract, but the vendor was about to commence an action against the vendee, who made a tender before the writ was issued, and the court held that it was not too late.   But the same author, in § 709 of his work, states the rule as to reasonable time as follows :  When the contract provides

that the payment is only to be made on demand or notice, a reasonable time must be allowed to fetch the money. See also 2 Schouler on Pers. Prop., § 291.

In *Blackwell v. Fosters*, 1 Metc. (Ky.) 88, the parties had bound themselves to give security for their respective performance of the contract, if at any time required, and the court held, in accordance with the rule just stated, that the party had a reasonable time to get security after demand.

In the Rhode Island case, *Furlong v. Barnes*, 8 R. I. 226, the plaintiff was ready with the money, on the evening appointed, to pay for the rags he had purchased, and the question in dispute was whether he was required to be at the place designated at a few minutes before nine o'clock or between nine and ten o'clock on that evening, and the court held that the contract must be reasonably construed, and that it was not necessary to show the time to a second or minute; but that "all that the plaintiff could be required to show was, that he was in the appointed place at the appointed time, in readiness to perform his part of the contract, and that the defendant made default."

And in *Toms v. Wilson*, 4 Best. & S. 442, it was held that a promise to pay "immediately on demand" could not be construed to deprive the debtor of an opportunity to get the money which he may have in bank or near at hand, and "if a condition is to be performed immediately. or on demand, that means that a reasonable time must be given, according to the nature of the thing to be done." And COCKBURN, C. J., said:

"By the terms of the bill of sale, the plaintiff was under obligation to pay this money *immediately upon demand* in writing, and if he did not then the defendants were entitled to take possession of and sell the goods.    Here such a demand was made.    The deed must receive a reasonable construction, and it could not have meant that the plaintiff was bound to pay the money in the very next instant of time after the demand, but he must have a reasonable time

to get it from some convenient place. For instance, he might require time to get it from his desk, or to go across the street, or to his banker's for it.''

In *Martindale v. Smith*, 1 Ad. & E. (N. S.) 389, the defendant, on the 23d of April, sold plaintiff six stacks of oats, then on defendant's ground, under an agreement by which the plaintiff was to have liberty to leave the stacks on the ground for four months if he saw fit, and was to pay for them in twelve weeks from the date of the agreement. In the beginning of July the defendant told the plaintiff that if he, plaintiff, did not pay on the 16th of that month, defendant would consider the contract at an end. The plaintiff did not pay on that day, but two or three days afterwards tendered the money, which the defendant refused to accept. Afterwards the defendant sold the stacks which had remained on his ground. In an action of trover it was held that the plaintiff could recover. The question before the court was whether the vendor had a right to treat the sale as at an end, and reinvest the property in himself, by reason of the vendee's failure to pay the price at the appointed time, and the court said:

''We are clearly of opinion that he had no such right, and that the action is well brought against him. For the sale of · a specific chattel on credit, though that credit may be limited to a definite period, transfers the property in the goods to the vendee, giving the vendor a right of action for the price, and a lien upon the goods, if they remain in his possession, till that price be paid. But the default of payment does not rescind the contract. . . . The vendor's right, therefore, to detain the thing sold against the purchaser, must be considered as a right of lien till the price is paid, not a right to rescind the bargain. And here the lien was gone by tender of the price.''

In the case at bar the vendor had more than a lien for the price of the goods. He had the property in the goods, and did not, at any time, agree to relinquish it until the

price was paid, and, therefore, the question of lien is not here applicable.

And in *Bass v. White*, 65 N. Y. 565, the plaintiff was prepared to pay for the coal, as agreed, upon receipt of the bill of lading, and expected to do so by check, as that was the custom among merchants in New York.  In fact, the defendants themselves first demanded a check in payment, but afterwards refused to take it as the bank had closed for the day, which was Saturday.  Plaintiff then brought a responsible friend who offered to indorse the check; this was refused.  And on Monday morning the plaintiff tendered to defendants the money for the amount of the bill, which was also refused.  Upon that state of facts, the court very properly held that the plaintiff was entitled to a reasonable time, after refusal of the check, to procure the money, and that until the morning of the next banking day was not unreasonable, "particularly as defendants did not inform him that he must procure the money at once or forfeit his contract."

We have but little doubt that if the plaintiffs in that case, instead of tendering their check at the time agreed on, had simply said that they had no money in New York, but would send elsewhere and have it forwarded at some other time, and the defendant had told them to procure the money at once or forfeit their contract, the decision of the court would have been in accordance with the principle laid down in *Gardner v. Clark*, 21 N. Y. 399, where it was held that a party under contract to deliver articles by the wagon load, and entitled to pay for each load as delivered, does not waive that right, but may treat the contract as broken by a single failure to make payment upon tender of delivery, although he has repeatedly delivered loads without payment and has given the other party no notice of his intention to insist upon immediate payment.

We think that it was the duty of appellants to be pre-

pared to pay the purchase price of the hops at the time they proposed to accept them, and having failed to do so, the defendant was at liberty to rescind the contract, and that his right of rescission was not defeated by the tender made subsequently to their default. They had all of the day on which the goods were accepted to make payment, and the fact that they could not then do so because the wires were down or there was no bank at Napavine, can have no effect upon the rights of the respondent. See *Beauchamp v. Archer*, 58 Cal. 431.

Having thus disposed of the principal question involved in the case, it is not necessary to discuss other objections raised by appellants.

The judgment of the court below is affirmed.

DUNBAR, C. J., and SCOTT, J., concur.

STILES, J. (*dissenting*).—I cannot but think that the court in its opinion has begged the whole question at issue. It cites all the cases which hold that a contract to pay "immediately upon demand" means reasonable notice and time to procure money after the notice, and then proceeds to bar the appellants of their rights under that rule upon two grounds—*First*, They knew the hops were coming; *second*, they signified that they accepted them. I said all I care to say upon the first point when this case was here before.

As to the second point: The letter of the contract is, that payment is to be made "upon delivery and acceptance of the same by said parties of the second part." Thus the acceptance by appellants was just as important to the completion of the transaction as delivery by the respondent; and there can be no question, and the majority do not deny, that Meeker & Co. could have postponed their acceptance at will until October 20th. Under the contract they controlled the situation that far, and the owner of the hops could do nothing but wait if they had chosen to say that

they would not accept until that day.    Now is it not a re-
finement of technicality to hold  that  because they did not
take advantage of their full rights under the express terms
of the contract, and keep Johnson dancing attendance until
the last day, they lost all rights of every kind because they
did not produce their money "immediately upon demand?"
I cannot look upon business transactions between men in
any such light, and I do not think the law contemplates the
bestowment of any such unfair advantage upon one party
to a contract over another, and therefore I dissent.

HOYT, J., concurs.