[No. 14883. Department One. February 11, 1919.]

FARMERS GRAIN & SUPPLY COMPANY, *Appellant,* v.
F. W. LEMLEY, *Respondent.*[1]

SALES (77)—FAILURE TO DELIVER—EXCUSE—BREACH. Where a
contract for the sale of bulk wheat required delivery within a certain time at a specified warehouse, inability of the warehouse to
receive it within the time specified does not absolve the seller from
making delivery as one of the concurrent acts which he assumed,
and he is liable in damages, where he declares the contract at an
end and makes no effort to make delivery at any place (Chadwick,
C. J., and Tolman, J., dissenting; overruled on rehearing).

ON REHEARING EN BANC.

SAME (77). Where a contract for the sale of bulk wheat, required delivery within a certain time at a specified warehouse,
inability of the warehouse to receive it within the time specified absolves the seller from making delivery and puts an end to the contract, where the buyer, upon notice of the conditions, failed to provide any place where delivery could be made without additional
labor or expense on the part of the seller.

Appeal from a judgment of the superior court for
Whitman county, Mills, J., entered November 2, 1917,
dismissing an action on contract, after a trial to the
court upon an agreed statement of facts. Affirmed.

*Samuel P. Weaver,* for appellant, contended, *inter
alia,* that it was defendant's duty to deliver the grain,
*in* the warehouse. *Culp v. Sandoval,* 22 N. M. 71, 159
Pac. 956; *Eckel v. Murphey,* 15 Pa. St. 488, 53 Am.
Dec. 607. ·

The tender must be made to the purchaser. 38 Cyc.
143, 144, 156; *Olsen v. Northern Steamship Co.,* 70
Wash. 493, 127 Pac. 112; *Coyle Consol. Cos. v. Swift
& Co.,* 42 Okl. 613, 141 Pac. 1114.

The defendant by his own contract laid a charge
upon himself which he was bound to perform or pay

[1]Reported in 178 Pac. 640; 181 Pac. 858.

the damages for nonperformance. 9 Cyc. 625-629; 35 Cyc. 244, 245; 6 R. C. L. 1014; 9 R. C. L. 997; *Isaacson v. Starrett,* 56 Wash. 18, 104 Pac. 115; *Reichenbach v. Sage,* 13 Wash. 364, 43 Pac. 354, 52 Am. St. 51; *Dermott v. Jones,* 2 Wall. (U. S.) 1; *Runyan v. Culver,* 168 Ky. 45, 181 S. W. 640; note, L. R. A. 1916F, pages 10-83; *Summers v. Hibbard, Spencer, Bartlett & Co.,* 153 Ill. 102, 38 N. E. 899, 46 Am. St. 872; *Hansen v. Dodwell Dock & Warehouse Co.,* 100 Wash. 46, 170 Pac. 346, L. R. A. 1918C 925; *Reid v. Edwards,* 7 Port. (Ala.) 508, 31 Am. Dec. 720.

The law required the defendant to tender the best possible delivery. 35 Cyc. 170, 177; *Larabee Co. v. Crossman,* 100 App. Div. 499, 92 N. Y. Supp. 565; *McKee v. Retter,* 10 Ill. (5 Gilman) 315; *Newell v. New Holstein Canning Co.,* 119 Wis. 635, 97 N. W. 487; *Fleishman v. Meyer,* 46 Ore. 267, 80 Pac. 209.

He was not excused from performance. 6 R. C. L. 327, 375; *Board of Education of Bath Tp., Allen County v. Townsend,* 63 Ohio St. 514, 59 N. E. 223, 52 L. R. A. 868; *Eugster v. West & Co.,* 35 La. Ann. 119, 48 Am. Rep. 232; *Williams v. Vanderbilt,* 28 N. Y. 217, 84 Am. Dec. 333; *Huyett & Smith Mfg. Co. v. Chicago Edison Co.,* 167 Ill. 233, 47 N. E. 384, 59 Am. St. 272, and note, pages 277-295; *Anderson v. May,* 50 Minn. 280, 52 N. W. 530, 36 Am. St. 642, 17 L. R. A. 555.

*Charles E. Fleming,* for respondent, contended, among other things, that the plaintiff was bound to allege and prove that he was ready and willing to receive delivery at the place of performance. 35 Cyc. 249, 250, 262, 619; Boone's Estee's Pleadings (4th ed.), § 1418; *Vail v. Rice,* 5 N. Y. 155; *Dunham v. Pettee,* 8 N. Y. 508; *Hawley, Dodd & Co. v. Kenoyer,* 1 Wash. Terr. 609; *Barton v. McKelway,* 22 N. J. L. 165;

*Meeker v. Johnson,* 5 Wash. 718, 32 Pac. 772, 34 Pac.
148; *Roberts v. Mazeppa Mill Co.,* 30 Minn. 413, 15
N. W. 680; *Hughes Produce Co. v. Pulley,* 47 Utah 544,
155 Pac. 337, L. R. A. 1916D 728.

It was not necessary to tender all of the grain at
the place of delivery. 35 Cyc. 169; 28 Am. & Eng.
Ency. Law (2d ed.), p. 5; *Hughes v. United States,*
4 Court of Claims 64; *Kane v. Borthwick,* 50 Wash. 8,
96 Pac. 516, 18 L. R. A. (N. S.) 486; *Gaines & Sea v.
Reynolds Tobacco Co.,* 171 Ky. 783, 188 S. W. 847.

Refusal to accept defendant's unequivocal offer to
perform discharged the contract. 9 Cyc. 625; 35 Cyc.
119, 176, 251; Boone's Estee's Pleadings (4th ed.),
§ 1389; *Robinson v. Thoma,* 30 Wash. 129, 70 Pac. 240;
*Madden v. Lemke,* 86 Mich. 139, 48 N. W. 785; *Wilson
v. Empire Dairy-Salt Co.,* 50 App. Div. 114, 63 N. Y.
Supp. 565.

MITCHELL, J.—On August 10, 1916, the parties to
this suit entered into a written contract as follows:

"Farmers Grain & Supply Co.            G48
        "Grain Contract                G48
"No. 52            Lamont, Wash., Aug. 10, 1916.

"The undersigned F. W. Lemley (called the seller)
sells and agrees to deliver to Farmers Grain & Sup-
ply Co. (called the purchaser), who agree to buy from
the seller twenty-five hundred (2500) bushels W. Hy-
brid Wheat at the price of $1.02 per bu. net weight,
free and clear of all encumbrances, on the basis of
No. 1 quality to be delivered and weighed at Farmers
warehouse at Ewan, in the State of Wash. on or be-
fore the 30th day of Oct. this year, in bulk, Barley or
oats may be—

"Marketable grain of the same variety, but lower
grade, grown by the seller will be received under this
contract, the purchaser to have a discount from the
contract price equal to difference in market value,
there prevailing, between quality delivered and qual-

ity stipulated.   Time of delivery is of the essence of this contract.

"The seller acknowledges receipt of $1 as earnest and part payment; balance purchase price, less all advances, payable with check or draft at the time of delivery.                        F. W. Lemley (Seller)
        "Farmers Grain & Supply Co. (Purchaser)
            "By R. W. Wallace (Their Agent)"

On November 28, 1916, the wheat not having been delivered, the purchaser brought suit to recover $1,075—the difference between the contract price and the market price on October 30, 1916.  After the issues were made up, the case came on for trial, at which time the facts were stipulated in writing and filed on June 22, 1917.   The trial court entered judgment against plaintiff, dismissing the action.   Plaintiff's motion for a new trial being denied, it has appealed from the judgment.

The facts of the controversy are as follows:

"That, on August 10, 1916, F. W. Lemley went to Lamont, Washington, to consult R. W. Wallace, the president of Farmers Grain & Supply Company, concerning the sale of certain Hybrid wheat; that, prior to this date the said R. W. Wallace and said F. W. Lemley were not acquainted with each other; that, in the course of their conversation, Wallace asked Lemley where he desired to deliver the grain and Lemley replied that he desired to deliver it at the Farmers warehouse at Ewan, Washington; that thereafter the price was agreed upon and their agreement embodied in a written contract; that Lemley took the said contract with him and later signed it and mailed it to Farmers Grain & Supply Company; that the original of said contract is herewith marked 'Exhibit A' and made a part hereof.

"That thereafter and on or about October 15, 1916, F. W. Lemley called R. W. Wallace, the president of Farmers Grain & Supply Company, by telephone and told him that the elevator was full and that it couldn't

handle the wheat at that time, that the elevator had been full on September 25, 1916, and was then full and could not receive the grain at that time. He also asked Wallace what could be done about the matter, that he was ready to deliver the grain; that when Lemley told Wallace that there were no bins to put bulk wheat in at the Farmers Warehouse at Ewan, Washington, Wallace answered that it was not his duty to furnish bins, and Lemley answered that it was not his duty to furnish them; that Wallace then told Lemley that he would grant an extension of time for the delivery and Lemley said that he had time enough to deliver; Lemley then told Wallace that he (Wallace) had two bins of bulk grain in the Farmers Warehouse and asked Wallace if he (Wallace) could not ship out and empty one of the bins so that Lemley could put the wheat in, and Wallace replied that it could be done if they could get cars to ship the grain out, and Lemley then told Wallace that if he could make such arrangements to let him know; Wallace endeavored to get cars to ship out the grain then in the bins but was unable to get any cars; Wallace also told Lemley that he did not own or have control of the bins in any way and that if he did ship the grain out that Lemley would have to get the bins from the management at the warehouse, but that Wallace would do anything he could to assist Lemley to secure the bins.

"That, after the making of said contract, Mr. Lemley procured the necessary wagon boxes in which to haul said bulk wheat to the warehouse, which was prior to the time when he knew that the warehouse could not receive the grain.

"That, on or about the 28th day of October, 1916, Mr. Lemley took a load of bulk grain to the Farmers warehouse at Ewan for delivery under the contract, and said warehouse refused to receive it for the reason that they had no room and no bins; Lemley asked the manager of the warehouse if he had sacks in which he could sack the grain and was informed that the warehouse did not have sacks, whereupon Lemley took the grain to the Milwaukee warehouse and sacked said grain and stored it in his own name.

"That a few days after November 1, 1916, Lemley went to the office of Farmers Grain & Supply Company at Lamont, Washington, and at that time he saw R. W. Wallace and told him that the elevator had no room to receive the bulk grain, and also told Wallace that he had sold the grain early so that he could get money to pay his threshing expenses; that anyhow the elevator was full and he could not get the money as he had figured; that Wallace then got his check book, contract and purchase report and told Lemley that he would pay him for the wheat and that the wheat could be left at the ranch until he could deliver the wheat in the warehouse at Ewan; that Wallace had begun to write a check when Lemley said that the wheat must be accepted as No. 1; that he had purchased the bins at St. John, Washington, and that there was danger of them leaking, or the grain spoiling from the wet weather; that Wallace replied that Lemley would of course be required to deliver the wheat at Ewan and have it graded according to the contract; that Lemley then said that he would not stand the loss of any spoiled wheat; Wallace then offered to furnish sacks to Lemley to sack the wheat so that it could be delivered at once to the Farmers warehouse at Ewan instead of at the elevator. Mr. Wallace says that he told Lemley that he would charge him a certain price for the sacks and that upon the delivery of the grain in the sacks he would allow him the amount originally charged for the sacks. Lemley says that he understood that he was to pay for the sacks. Lemley then told Wallace that he had already started plowing and couldn't afford to put off the plowing and haul the wheat. When Lemley left Wallace that day he said he would think the matter over, however, and let him know. Lemley told Wallace that he considered the contract at an end because it had been impossible for the warehouse to receive the grain within the time mentioned in the contract.

"J. H. Beaughan, who was then working for the Farmers Grain & Supply Company, at the request of Mr. Wallace, went to see Mr. Lemley on or about the

20th day of November, 1916; Beaughan went to Lemley's ranch and there he saw two loads of sacked grain by a gate. Lemley told him that it was his grain and that he was hauling it to the Milwaukee warehouse at Ewan. Beaughan then asked Lemley if he would turn the tickets of the Milwaukee Warehouse Company over to the Farmers Grain & Supply Company, and Lemley replied that he would not do so. Lemley said that he was under no obligations to haul the wheat under that contract. Beaughan then showed Lemley a letter written by Mr. Samuel P. Weaver, in which Mr. Weaver set forth that Mr. Lemley, in the event that he did not deliver the wheat, would be liable in damages to the Farmers Grain & Supply Company for the difference between the contract price and the market price on October 30, 1916; that Mr. Lemley read the letter and said that that letter had nothing to do with his case. Lemley said further that the contract had expired and that he was hauling the grain in his own name.

"That the market price of White Hybrid wheat No. 1 quality at Ewan, Washington, on October 30, 1916, was $1.45 per bushel; that the Farmers Grain & Supply Company had the money and was financially able to pay for the wheat."

Whatever the pleadings in this case may be, the cause must be determined upon the stipulated facts. On August 10, 1916, in making the contract, it is plain both parties, anticipating no difficulty, thought that delivery of the wheat would be made by weighing and storing it at the Farmers warehouse at Ewan, a depository selected by respondent. An unexpected situation arose. At the time respondent chose to attempt delivery of the wheat, the warehouse or elevator was full, and it continued so. Appellant was not at fault, nor was respondent thereby released from his obligations under the contract. The claim of respondent that appellant's rights were in any way affected or abridged by respondent's taking a load of bulk grain

to the Farmers warehouse at Ewan for delivery under the contract on October 28, 1916, is without merit. He already knew the warehouse was full, and at the same time he had no right to expect appellant would be present, since there had been no modification of the contract which contemplated storing the grain, as it was hauled, in the warehouse without the necessity of appellant being present. After October 28, 1916, respondent did nothing in the way of a tender or offer of delivery of the wheat at any place or in any manner. Respondent did not do the idle thing of attempting to deliver any wheat at the warehouse on October 29-30, nor the appellant to appear there for any purpose, because the warehouse, being already full, rendered both parties helpless for any such purposes. A few days after November 1, 1916, respondent, not being yet absolved from his obligation under the contract, called on appellant to discuss the matter. In that discussion appellant made offers to bridge the trouble, one of which, made as he was writing a check in full payment for the wheat, was that he would pay for the wheat and let it remain at the ranch until it could be delivered at the warehouse at Ewan. Respondent hedged on every proposition made by appellant, but offered no solution or plan of his own. True, in that conversation respondent told Wallace, president of appellant corporation, he considered the contract at an end *because it had been impossible for the warehouse to receive the grain within the time mentioned in the contract,* but *"when Lemley left Wallace that day he said he would think it over and let him know."* As to the statement of respondent that he considered the contract at an end because the warehouse could not receive the grain, appellant cannot be held responsible for an erroneous notion of respond-

ent's, nor for a condition upon which that notion was based, to which he in nowise contributed. Appellant might have, with greater show of reason, informed respondent that it considered he had broken his promise to deliver and weigh the wheat at the warehouse and would hold him responsible in damages. When respondent left, he said he would think it over and let appellant know, and not hearing from him, appellant, a few days later, sent an agent to him. Respondent informed the agent that he was hauling the grain in sacks to the Milwaukee warehouse at Ewan, and upon being asked if he would turn the tickets of the Milwaukee warehouse over to the appellant, replied he would not do so, that he was under no obligations to haul the wheat under that contract; and further stated that the contract had expired and that he was hauling the grain in his own name.

It is evident respondent now plants himself squarely on the contention that the contract was at an end, and that he was released because it had been impossible for the warehouse to receive the wheat towards the close of the time mentioned in the contract. This claim is made in the face of the terms of his contract, and in spite of his conduct in treating with appellant subsequent to the time limit fixed in the contract.

Counsel for respondent quotes with approval the following

"If the acts stipulated for are to be performed at the same time, the conditions are concurrent, as where the contract stipulates for delivery and payment to be made on delivery." 35 Cyc. 112.

Indeed, where the contract is silent as to time of payment, delivery and payment are concurrent conditions. But in applying the rule counsel contends that it imposes upon the appellant the burden of showing it had performed all conditions *precedent,* and

that the obligation resting on it was to receive the wheat within the time and at the place provided in the contract. On the contrary, the rule quoted, which is the correct one, simply means, when applied to this contract, that the obligation of respondent to deliver and weigh the wheat at the Farmers warehouse and the obligation of appellant to pay the balance due at that time and place were concurrent. There is no question of condition precedent involved in the case. In the absence of any provision in the agreement fixing a place for delivery, the general rule is that the delivery shall be made at the place where the goods are at the time of sale, usually the place of business of the seller. In this case, however, appellant asked respondent where he wished to make delivery. Respondent selected and designated the place, and, as it appears, made no arrangements with the owner of that place for storage. He waited for nearly two months after making the contract before inquiring if he could get storage, at which time he learned he could not. He then waited twenty days before notifying appellant of the condition of the warehouse. The delivery and weighing of the wheat at the place selected by respondent was that one of the concurrent obligations of the contract which he assumed, and having done so unconditionally, he will not be permitted to place the blame for his subsequent inability to perform on the other party to the contract. In the case of *Isaacson v. Starrett,* 56 Wash. 18, 104 Pac. 1115, the law is declared as follows:

"The failure to deliver within the time breached the contract, and if, as contended by appellant, his performance was impossible because of subsequent happenings, he was nevertheless liable to respondent for his breach. Having assumed under his contract to deliver within a stipulated time, he was bound to make

such delivery.  He could have protected himself in the contract had he desired to do so, but having failed to do so, he must be held answerable for the damages caused respondent because of the broken contract to deliver.''

In harmony with the rule just mentioned is another that respondent failed to observe.  It is to the effect:

''While strict or literal performance of the contract was therefore rendered impossible, the defendants were not absolutely relieved from their obligation. They were bound to make tender of the best delivery possible under the circumstances; . . .'' *Labaree Co. v. Crossman,* 100 App. Div. 499, 92 N. Y. Supp. 565.

See, also, *McKee v. Retter,* 10 Ill. (5 Gilman) 315; 35 Cyc. 170, 177.

And yet, as already noticed, respondent made no attempt whatever, or offer of any kind, to deliver the wheat after he found the warehouse could not receive it.  The nearest approach to an offer of delivery was in November, when appellant offered to pay for the wheat and let it remain at the ranch, and respondent stated that the wheat must be accepted as No. 1—thus demanding a modification of the contract to his advantage.

Promptly upon respondent's specific disavowal of liability upon the contract, appellant sued.  Citation of authorities is not necessary in support of the well known rule that a refusal on the part of the seller to comply with his contract entitles the buyer to sue to recover his damages, which in such case as this is the difference between the contract price of the article and its market price at the time of the breach of the contract.

The judgment is reversed, and the cause remanded with directions to enter judgment in favor of appel-

lant for the sum of $1,075, with interest at six per cent per annum from October 30, 1916.

MAIN and MACKINTOSH, JJ., concur.

TOLMAN, J. (dissenting) — I dissent. Respondent contracted to deliver grain in bulk only. It is a well known fact, of which we may take judicial notice, that bulk wheat differs from sacked wheat, in that the latter includes the labor of sacking and the cost of the sacks in which it is contained, and commands a higher price in the market than bulk wheat. Therefore, under the contract, respondent was under no duty, in any event, to deliver sacked wheat. The place of delivery was mutually agreed upon and named in the contract, and it is immaterial which party first proposed it. Presumably it was a public warehouse, as we cannot assume that the parties contracted for delivery at a private warehouse controlled by neither, without consulting the person who did control it. The wheat when delivered to such warehouse would belong to appellant, and the warehouseman would become its agent to care for the wheat, and not the agent of respondent, whose interest in the wheat would cease upon making delivery. Therefore, when appellant was advised that the warehouse named in the contract could not receive the wheat in bulk, it was its duty, within the time fixed for delivery, or at least within a reasonable time, to provide means by which respondent could deliver the wheat to it, without additional labor or expense on his part over the labor and expense of the delivery provided for in the contract. In my opinion, respondent did all that the law requires when he advised appellant of conditions at the warehouse, and that he was ready to make delivery; and the facts, as stated in the majority opinion, amply

convince me that he waited a reasonable time thereafter for appellant to provide means for receiving the wheat. If any tender was required, the tender made was sufficient. *Roberts v. Mazeppa Mill Co.,* 30 Minn. 413, 15 N. W. 680. To hold otherwise is to say that buyers of grain, stock, and other like products, may, in all such cases, compel the seller to hold the product indefinitely at his own risk and expense, while the buyer awaits an advance in the market price. It is no answer to say that appellant offered to provide sacks, or to pay for the wheat and permit respondent to make delivery later. As to the first proposition, appellant did not offer to furnish sacks and the labor of sacking the wheat; and as to the latter, it is well known that but few farmers have facilities for holding grain for any length of time without danger of loss and deterioration; and the offer was insufficient unless it included, besides the offered payment, a like immediate grading and weighing, so that any subsequent loss in quantity or quality would fall upon the buyer only. In the nature of things, the buyer of wheat must provide the place in which it is to be stored when delivered to him; and this the buyer in this case did not do.

The authorities cited in the majority opinion have no application to the facts. Much more applicable is the case of *Duckham v. Smith,* 5 T. B. Mon. (21 Ky.) 372, in which it is held that a covenant to deliver at a warehouse does not require the covenanter to put the goods in the warehouse; and the case of *Lockhart v. Bonsall,* 77 Pa. St. 53, in which it is held that, where the buyer of 118 cars of oil directed its delivery at a certain sidetrack which would hold but 12 cars, the storing of the remainder upon nearby sidetracks was a delivery. In principle, our own case of *Meeker v.*

*Johnson,* 5 Wash. 718, 32 Pac. 772, 34 Pac. 148, is in harmony with these views.

The judgment appealed from should be affirmed.

CHADWICK, C. J., concurs with TOLMAN, J.

## ON REHEARING.

[*En Banc.* May 31, 1919.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adopts the dissenting opinion heretofore filed in this case as the opinion of the court, and the judgment appealed from will be affirmed.